```
LAW OFFICES OF BASTIAN & DINI
ROBERT L. BASTIAN, JR. [SBN 170121]
MARINA R. DINI [SBN 169176]
9025 Wilshire Blvd., Suite 500
Beverly Hills, CA 90211
Phone:  (310) 789-1955
Fax:    (310) 822-1989
Email:  robbastian@aol.com;
        miadini@aol.com
```

Attorneys for plaintiff
ROBERT W. HIRSH

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT W. HIRSH,<br><br>    Plaintiff,<br><br>v.<br><br>CALIFORNIA COMMERCE CLUB, INC., *et al.*,<br><br>    Defendants. | No. 2:22-cv-05701-MCS-AS<br><br>**DECLARATION OF PLAINTIFF ROBERT W. HIRSH IN SUPPORT OF HIS OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION BY DEFENDANTS CALIFORNIA COMMERCE CLUB, INC., AND SHALIN HALL**<br><br>*[Filed Concurrently with Opposition to Motion for Summary Adjudication and Statement of Genuine Issues of Material Fact]*<br><br>Hearing Date:   July 10, 2023<br>Time:           9:00 a.m.<br>Ctrm:           7C<br><br>*Before the Honorable Mark C. Scarsi* |

I, Robert W. Hirsh, declare:

1.  I am the plaintiff in this lawsuit. I am also a duly admitted attorney in all California courts, including this court. My practice has historically focused upon real estate and business litigation. For over 30 years, I have been ranked as an AV Pre-eminent attorney via the peer review Martindale Hubbell system.

-1-

**DECLARATION OF PLAINTIFF ROBERT W. HIRSH**

2. This declaration is made in support of my opposition to defendants County of Los Angeles, Deputy David Magdaleno, and Deputy Jorge Bermudez's motion for summary judgment, and in opposition to defendants California Commerce Club, Inc., and Shalin Hall's motion for summary adjudication.

3. I have personal knowledge of all the facts set forth herein. If called and sworn as a witness, I could and would competently testify to the following:

4. On January 21, 2022, I drove to the California Commerce Club casino where I have often enjoyed playing low stakes Texas Hold'm poker in a relaxed, informal environment.

5. In the casino security video lodged herewith and designated as Plaintiff's Exhibit A, Video 1, the first of thirty-one security videos attached as Plaintiff Exhibit A [hereinafter, "A-1, A-2 . . . A-31"], that is me parking in the casino's parking lot and walking in. [I have reviewed the 31 security videos previously provided by defendants and lodged herewith. They depict the time I was at the casino on January 21, 2022, and capture the events I am testifying to below. In all instances where I give time estimates, it is based upon my review of the counter at the bottom of each video.]

6. In videos A-2 and A-3, that is me walking into the casino. Because we were amidst the COVID 19 pandemic, the casino provided face masks. I was handed a mask and I put it on.

7. In video A-4, that is me walking to an electronic device on the casino floor and putting my membership card into it. The card is, casino staff had instructed me, used to give floor staff notice of someone needing assignment to a card table and keeping track of hours for promotional reasons, such as rewarding members with food and drink. The card was accepted and worked as it always had for me on prior occasions.

8. As depicted in video A-5, I walked across the casino floor and a casino

-2-

**DECLARATION OF PLAINTIFF ROBERT W. HIRSH**

staff member assigned me to a table. I carried a plastic bottle of water conspicuously in my hand, clearly visible to the casino staff member with whom I interacted.

9.  On prior occasions at this casino during the pandemic, I had been expressly told by casino staff that it was permissible to have a water bottle on the floor. I was told that I was permitted to drink if I rolled away from the table, then when finished, replaced my mask before I rolled back to the table. The casino staff member in A-5 did not instruct me otherwise.

10. Having access to water was important to me because I suffer from several medical conditions, not least, diabetes. I need access to water to stay hydrated and clear headed while I play cards, and to take medications as necessary.

11. At video A-5 and the beginning of A-6, I was seated at what I believe the casino designates as Table 41. A-7 is an overhead of me being seated at Table 41. I was not concealing my water bottle from the dealer who is sitting in front of me, as the video reflects. For the duration of A-6 [approximately 21 minutes, according to the video counter] and A-8 [approximately 26 minutes, according to the video counter], a total of approximately 47 minutes, I played uninterrupted at Table 41. The dealer at Table 41 never commented on or barred me from having a water bottle.

12. Video A-9 shows where I picked up my casino chips and water bottle and moved to what I believe the casino designates as Table 40. For the approximately 24 minute duration reflected on A-9, I played at Table 40, uninterrupted. At 19 minutes, 5 seconds reflected on A-9 [9 minutes, 41 seconds on Video A-10, the overhead of Table 40], I swivelled away from the table, as casino staff had previously instructed me, took a drink from my water bottle, and replacing my mask, swivelled back. The dealer, sitting in front of me, neither objected or instructed me otherwise.

13. For the next approximately 40 minutes, I played uninterrupted as is reflected on Video A-11. At approximately 48 minutes, 50 seconds, I was abruptly

**DECLARATION OF PLAINTIFF ROBERT W. HIRSH**

interrupted by a casino employee, later identified to me as Nancy Zhang ["Zhang"], who yelled at me that I was not allowed to have a water bottle on the floor. Her manner was insulting and rude. I explained that I was diabetic, I needed the water bottle for medical reasons, and that I had previously been told by casino supervisors both that having a bottle on the floor and making use of it, as I had been, was acceptable. Her response was hostile. As reflected on video A-11, she walked around the corner of the table by the wall, a few feet from where a water bottle on the floor belonging to the player playing two seats to my left, and made a call on her cell phone.

14. As also reflected in Video A-14, Zhang walked back to me while still on the phone and spoke with me. This conversation lasted, per the video counter, approximately 1 minute, 30 seconds. During the conversation, Zhang directed the dealer to deal me out. Again, I told her that I needed the water to stay hydrated and to take my medications. I pulled out and showed her my bag of medications [as also reflected on Video A-13, the overhead of Table 40 at 42 minutes, 50 seconds]. She screamed at me "no water" and walked away. For the approximately next 3 minutes, I sat there stunned and reflected. I, then, walked over to customer service to make a complaint.

15. When I reached the customer service desk, defendant Shalin Hall ["Hall"] was there. On one prior occasion, the two of us had clashed.

16. Hall's demeanor towards me was even more hostile than Zhang. Hall falsely stated that, on a prior occasion, she had permanently banned me from the casino. I responded that this was not true. I then explained that I had a valid medical reason under the ADA, *i.e.*, diabetes, for having the water bottle at my side. She said that she was not interested in hearing about it. I then asked her to direct me to her supervisor so I could make a complaint. This appeared to infuriate her and her tone became increasingly defiant and hostile. The video of this conversation is

-4-

**DECLARATION OF PLAINTIFF ROBERT W. HIRSH**

reflected in Videos A-15, -16 and -17. During this conversation, nor at any other time this evening, did I raise my voice, lose my composure or behave disrespectfully.

17. During this conversation, a casino security officer, whom I later learned is Joaquin Cesenas, watched at the counter to my left. At the end of my conversation with Hall, Cesenas approached and told me there was a form I could sign which would purportedly "unban" me. I asked to see it. He asked me to walk with him to the security office to sign the form. Video A-18 reflects the two of us walking to the security office.

18. Once inside the office, I sat down at Cesenas' request. I told him I could not sign anything without having my attorney review it. I asked to take it with me for my attorney's separate review. He then said that he would not give me the document. As can be seen in Video A-19, this office visit lasted less than 30 seconds.

19. Cesenas and I then walked back to the customer service counter as Videos A-20 and A-21 reflect. Another security officer followed and was shadowing me at the counter. At the counter, I spoke briefly with Hall and said that I would be calling 911. I called 911 because I was scared that security was going to physically harm me. I thought the officer's presence would prevent security from unduly and physically ejecting me from the premises. I also wanted law enforcement there because I wanted the protection of an accurate police report, as I thought my rights under the ADA, including my civil rights, were being violated.

20. I placed a call to 911 near the first table, as reflected in Video A-22, on the casino floor while Cesenas and another security officer shadowed me. At reflected at one minute, thirty seconds into Video A-22, a third security officer arrived. As also reflected in Video A-22, after speaking with Cesenas, the third officer walked with Hall off screen. As reflected at five minutes, fifty seconds on Video A-22, I was being shadowed by three security officers while I sat at the table calling 911. Another view of the shadowing by the three security officers is reflected

-5-

**DECLARATION OF PLAINTIFF ROBERT W. HIRSH**

in Video A-23 from approximately 1 minute, 45 seconds to 12 minutes when, still a fourth security officer arrived.

21. Because I was intimidated and scarred, and because I was having trouble hearing the person on the other end of the phone call due to the noise in the casino, I retreated into the men's room for privacy and to make a another call to 911, as reflected in the last five seconds of Video A-22, in Video A-23 at 12 minutes.

22. When I left the men's room approximately six minutes later, as reflected at 18 minutes, 14 seconds on Video A-23, I walked by defendant deputies David Magdaleno and Jorge Bermudez. I initially did not recognize that they were deputies as opposed to casino security staff who wore similarly shaded uniforms. Video A-24 is another angle of this brief moment. When the deputies identified themselves, I turned and acknowledged them. I said Hello, that I was glad they were there, and I wanted them to take a police report. Then, I invited them to sit down at a table with me so I could explain what had occurred. Further, I was feeling lightheaded and needed to sit down. In this brief moment, neither indicated disagreement. I started walking in that direction a few steps ahead of them. Within a few seconds, each grabbed me by the arm. Deputy Magdaleno aggressively told me I was a "trespasser." Both deputies placed me in control holds. Deputy Magdaleno was particularly aggressive in yanking my arm and causing excruciating pain to my left shoulder, left elbow and left forearm, injuries for which I subsequently received medical treatment and physical therapy. I audibly replied in pain as the deputies were handcuffing me. As reflected at the end of Video A-23, the two deputies forcibly walked me outside. Videos A-26, -27, and -28, capture the walk to an LASD patrol vehicle.

23. I told Deputy Magdaleno several times that I was the one who called the police and I wanted to give a statement and have him take a full report. I also told him what he was doing was wrong. In response he made statements to the effect of

-6-

**DECLARATION OF PLAINTIFF ROBERT W. HIRSH**

"shut up, or keep your mouth shut and if you don't, I'm going to taser you."

24. I repeatedly told the deputies I was in pain and asked them to adjust the handcuffs. Deputy Magdaleno responded by again threatening to taser me. I had problems walking, not least because of the pain, but also because the elastic band on my gym shorts was failing and I was light-headed. One deputy told me to hold them up with my hands. I couldn't because of the way my hands were cuffed and, outside, the shorts ultimately fell, and the deputies had to lift them back up.

25. As these events were occurring, I started to develop adverse symptoms which increased in severity. My heart was pounding. I was sweaty. I was clammy. I was experiencing a headache. I felt lightheaded. I felt like I was going to pass out. I felt dizzy. I had shortness of breath. I asked several times to be permitted to take my medications. I also asked for water. Each time I was denied. Both deputies searched my pockets and put my medications on the patrol vehicle's front hood.

26. The deputies then maneuvered me into the second row of seats in the patrol vehicle. My heart was racing and I was having problems breathing. I asked the deputies to lower a window. Instead, they locked me in the vehicle with the windows closed. While in the vehicle, I slumped over to my left, my eyes shut. I felt like I had fallen asleep or had just blacked out, and then at some point, after a period of time, I came back.

27. Sometime during this sequence, a deputy asked if I wanted the paramedics to be called. Yes, I said. Paramedics arrived at 10 minutes, 9 seconds as reflected on Video A-30.

28. The paramedics took my vitals and told me that my heart rate was elevated to 166, a condition known as tachycardia. A paramedic asked if I wanted to be taken to the hospital. Fearful that if I would remain in custody, among other things, I would have to wait even longer for my meds and water, and wanting to go home where I knew my wife, a retired emergency room doctor, could take proper

care of me, I told the paramedic that I would rather take a chance on my own than remain in the custody of these deputies. As reflected at 16 minutes, 25 seconds on Video A-30, one deputy uncuffed me.

29. After I took my medications, as reflected at five minutes, twenty-five seconds on Video A-31, the deputies asked me to stay longer so that they could present me with a document. I waited. Deputy Magdaleno presented me with a document from the casino and asked me to sign it. In response, I told him that I would not sign any document without the independent review of separate counsel. He walked away with the document as reflected at 9 minutes on Video A-31.

30. I would later learn during this litigation that the deputies gave my identification, which they had confiscated from me, to the casino security staff so that they could research me in the casino's security office. I was not asked for my permission and I did not consent to this.

31. Before I left, deputy Magdaleno handed me a pamphlet bearing the shield of the LASD, entitled "Report Information and Victim's Bill of Rights." A true and correct copy of the screen shot of the front page is concurrently filed as Plaintiff's Exhibit I. Handwritten on it are the date of the incident, deputy Magdaleno's name and badge number, the East Los Angeles station and classification of the incident as "415B." To the extent that this is a reference to California Penal Code § 415 [disturbing the peace] – I am unaware of a "P.C. 415B" – I never disturbed the peace and I never engaged in any conduct during the evening that could be construed as disturbing the peace.

32. After I was released, while still outside the casino, I had a conversation with Deputy Magdaleno who told me that this is exactly what the sheriff's department does, that he's there every night or every other night removing casino's patrons at the casino's request.

33. After deputy Magdaleno left, while still outside the casino, I had a

**DECLARATION OF PLAINTIFF ROBERT W. HIRSH**

conversation with casino security Lt. Eric Rodriguez. I shared with him what Deputy Magdaleno had just told me as attested in the proceeding paragraph. I asked him if that was true. He said Yes.

34. Regarding the claim that both deputies made in their response to Plaintiff's Interrogatories, Set One, No. 8, propounded on each, that I "kept walking away from defendant feigning like [I] had not heard defendant which suggested a consciousness of guilt and obstructed, delayed defendant's investigation," this is inaccurate in its entirety. I did not feign anything. Nor was any command made before the had grabbed me, as I understand they now are contending. No one could have reasonably concluded that I was feigning anything. As for defendants' current contention that I delayed their investigation, this too is inaccurate. Mere *seconds* elapsed from my first encounter with the deputies and the two arresting me.

35. As for the deputies' allegations of my purported "consciousness of guilt," as an experienced business and real estate attorney, I am very familiar with the law with respect to business invitees and trespass. At no time during that evening was I anything other than a business invitee and I never trespassed. As I attested previously, upon entering, I registered with the casino and was invited to play poker at a table.

36. Moreover, that evening, I was self-possessed, courteous and respectful in all of my interactions with casino customers and staff, which is also reflected in each of the 31 videos lodged with the Court.

37. During the evening, I never interfered with the lawful operations of the casino. I never threatened any casino employee or patron. I never posed as "a danger to self or to others." I never presented as "a flight risk." Nor was I ever previously "permanently banned" from the casino.

38. On several occasions that evening, I did state my view that the rule of no water bottles on the casino floor was being selectively and dishonestly enforced

against me and that it, given my medical condition, violated my rights under the Americans with Disabilities Act [ADA], among other laws.

39. In short, I did nothing which justified the heavy-handed and vindictive retaliation that I experienced from Hall's deception, joined and participated in by the two deputies who, without evenhandedly investigating the matter, arrested me.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that this declaration was executed on June 15, 2023 in Beverly Hills, California.

*Robert W. Hirsh*
Robert W. Hirsh

-10-

**DECLARATION OF PLAINTIFF ROBERT W. HIRSH**

# CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of June, 2023, I caused to be served electronically **DECLARATION OF PLAINTIFF ROBERT W. HIRSH IN SUPPORT OF HIS OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION BY DEFENDANTS CALIFORNIA COMMERCE CLUB, INC., AND SHALIN HALL** on the following person(s):

Michael J. Ryan, Esq.                        mryan@sksrlawyers.com
Ani Khachatryan, Esq.                   akhachatryan@skssrlawyers.com
STEARNS & RYAN, Lawyers
11777 San Vicente Blvd., Suite 555
Los Angeles, CA 90049
Attorneys for Defendants California
Commerce Club, Inc. and Shalin Hall

Rickey Ivie, Esq.                                 rivie@imwlaw.com
Marina Samson, Esq.                         msamson@imwlaw.com
Ayang Inyang, Esq.                            ainyang@imwlaw.com
IVIE McNEILL WYATT PURCELL & DIGGS
444 S. Flower Street, Suite 1800
Los Angeles, California 90071
Attorneys for Defendants County of
Los Angeles and LASD Deputies
David Magdaleno and George Bermudez

And I hereby certify that I will mail the document by U.S. mail to the following non-filing user: Not applicable.

/s/ *Robert L. Bastian, Jr.*
ROBERT L. BASTIAN JR.

END OF DOCUMENT

-11-

**DECLARATION OF PLAINTIFF ROBERT W. HIRSH**